GEORGE S. HARRIS, PLAINTIFF-RESPONDENT, v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, DE-FENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 18, 1963—Decided April 8, 1963.

Before Judges PRICE, SULLIVAN and LEWIS.

*Mr. Nicholas Conover English* argued the cause for appellant (*Messrs. McCarter & English,* attorneys).

*Mr. Jerry M. Finn* argued the cause for respondent (*Messrs. Greenstone & Greenstone,* attorneys; *Mr. Finn,* on the brief).

The opinion of the court was delivered by

PRICE, S. J. A. D.   Defendant seeks to reverse a judgment entered in the Superior Court, Law Division, in favor of plaintiff in the sum of $4,800. The case was tried without a jury.

The judgment represented the amount claimed by plaintiff to be due to him under the terms of an "accident income policy" issued by defendant to plaintiff. The policy provided coverage for disabilities, arising out of bodily injuries sustained by the insured, "as the direct result of an accident,

independent of all other causes." The policy, under the section captioned "Exceptions," contained the provision that:

"1. This policy does not cover, and no payment shall be made for, disability or other loss caused or contributed to by any of the following:

\*      \*      \*      \*      \*      \*      \*      \*

(f) Disease, or bodily or mental infirmity, or medical or surgical treatment or diagnostic procedure for such disease or infirmity."

On February 11, 1959, while the aforesaid policy was operative, plaintiff, a steel fabricator, suffered a myocardial infarction while at work, as the result of which he was hospitalized for many weeks and allegedly permanently prevented from resuming his regular occupation. He contended that the circumstances, hereinafter recited, surrounding the onset of the attack, were such as to entitle him to disability payments under the aforesaid policy of insurance, and that defendant, by its refusal to make such payments on his demand, had breached its contract of insurance. Defendant contended, as expressed in the pretrial order, that "plaintiff did not sustain any injury" resulting from an accident "within the meaning" of the aforesaid policy. The issue thus projected was the sole issue for resolution at trial.

Following the presentation of proofs, the trial court initially determined that "the injury suffered by plaintiff did not come into being as a result of an accident." An accordant judgment, dismissing plaintiff's complaint "on the merits and with prejudice," was entered. Thereafter the court granted plaintiff's motion to vacate the judgment and, in reversal of its former opinion, directed the entry of judgment in favor of plaintiff for the aforesaid sum of $4,800. From that judgment defendant appeals. It does not challenge the amount thereof, as such, contending only that plaintiff had no right to any judgment in his favor as he did not "sustain the burden of proof that his disability came within the coverage of the policy." Asserting that the "facts are undisputed,"

defendant asks that the judgment under review be reversed and that we direct the entry of judgment in its favor.

We consider the factual situation revealed by the record.

Plaintiff, approximately 48 years of age, had worked for 25 years for Welded Products Company of Newark as a steel fabricator. He described his duties as "forming, setting up, erecting, delivery of tanks, unloading * * * and loading steel." On February 11 his specific task involved the transportation of two cylindrical steel tanks, one approximately four feet in diameter, eight feet in length and weighing 600 pounds, the other five feet in diameter, ten feet in length and weighing approximately 800 pounds. They "were loaded lengthwise" onto a "flat-bed truck" by an electric hoist. At the place of delivery the tanks were to be moved from the truck to a platform which was about six inches higher than the bed of the truck. At that place the unloading of the tanks was to be accomplished with the aid of a "small electric fork truck" which would raise one end of each tank to the level of the platform. Plaintiff would then, unaided, push the tanks off the truck.

Plaintiff testified that as he was pushing the 600-pound tank off the truck onto the platform he "became short-winded or out of breath" and "felt like [he] was on fire inside * * *; like something was pushing [his] chest out." He further testified that, after resting for approximately five minutes, he was able to "breathe a little easier" and finished moving the first tank from the truck to the platform. After he had moved the larger tank about six feet to the place on the truck where the "forklift could come in contact with it," he experienced a "swelling sensation" in his chest, his "arms felt weak" and his "legs felt rubbery." Following five minutes of rest he completed the removal of the second tank from the truck to the platform. He then drove the truck away from the plant where the delivery had been made, but he had progressed only a short distance when he was stricken with a burning sensation in his chest, suffered shortness of breath, and temporarily lost the use of his arms. He brought the

truck to a halt "by slowing it down with the brakes and then releasing the clutch to stall the motor." He was assisted from the truck by men working nearby, police responded to a call, and plaintiff was removed by ambulance to a hospital, where he stayed for several weeks. Thereafter he was obliged on two successive occasions to be hospitalized because of additional heart attacks. Prior to the date of the initial attack plaintiff had not experienced any heart disorder and had been in exceptionally good health. The uncontradicted testimony was that in the 25 years of his employment he had not suffered any loss of time from work due to illness except for a "two-day" attack of dysentery.

Medical testimony presented by the respective litigants revealed no areas of substantial dispute. The proofs clearly show that plaintiff suffered an acute myocardial infarction. Although the opinion of the respective witnesses varied somewhat as to whether arteriosclerosis pre-existed the aforesaid attack and, if it did exist, to what extent it had progressed prior to February 11, 1959, and also the extent of its contribution, if any, to the onset of the attack, there was general agreement that "some arteriosclerosis" exists in most every person. There was no serious dispute that a causal relationship existed between the effort expended by plaintiff in moving the heavy tanks and the attack he suffered. Although Dr. Jerome Kaufman, defendant's medical expert, expressed the view that "the myocardial infarction resulted from the coronary arteriosclerosis," he flatly labeled as "speculative" the possibility that plaintiff might have suffered the myocardial infarction had he been asleep instead of being engaged in active laboring work when stricken. He said:

"[W]e must face reality; * * * this man did exert himself. And so for that reason I believe that the exertion contributed to the onset of the myocardial infarction."

Amplifying the above statement Dr. Kaufman further testified as follows:

"Q. Doctor, would you describe to the Court, if you will, how in your opinion the strain of doing this work of pushing the two tanks, one weighing 800 pounds and one weighing 600 pounds, contributed to this myocardial infarction? A. It is a purely theoretical concept. We don't know how it happens, but we feel that where there is an unusual strain or where an individual goes beyond his physical capacity in effort that there may be a hemorrhage which fills up the vessel which causes the thrombosis, or that because he has a narrow vessel there is an insufficiency of blood to the heart muscle; that the supply of blood is not as great as the demand of blood, and that results in the closure of the vessel and infarction.

Q. In other words, Doctor, because of the use of the muscles involved in pushing these tanks and because these muscles would require a greater supply that the supply to the heart is lessened? A. That is correct."

In light of the foregoing proofs defendant contends that plaintiff did not bear the burden of establishing that the myocardial infarction was sustained as the "direct result" of his "exertion, independent of all other causes." Furthermore, it asserts that plaintiff's claim should have been rejected by the trial court because the evidence "does not exclude coronary arteriosclerosis or other disease or bodily infirmity as a contributing cause of plaintiff's heart attack * * *."

Defendant argues that (1) where recovery has been allowed in actions based on policies of the type here involved "a traumatic accident" occurred, "after which symptoms constituting disability manifested themselves"; (2) in the instant case "there was no trauma, nor was there any accident, and the disabling symptoms appeared before any unusual, unexpected or unforeseen occurrence had taken place"; (3) under the proofs in the case at bar "it is not necessary to postulate an accident in order to account for the plaintiff's myocardial infarction"; and (4) "plaintiff's *heart attack* may have been the accidental result of his pushing the tanks, but *it* was not the result of an accident." (Emphasis supplied) In conclusion, defendant asserts: "Everything that plaintiff did in pushing the tanks was done voluntarily and deliberately, and it was all carried out just as he intended and planned. It

was only the result of these activities,—namely, his heart attack, that was unforeseen and unexpected."

There is no doubt, as revealed by the briefs and oral arguments of respective counsel herein, that within various jurisdictions there exist opposing views as to a claimant's right to recover on an "accident insurance policy" under circumstances such as are here present. Some jurisdictions hold

"* * * where a heart attack or heart failure causing death or disability is, having regard for the activity being carried on, an unusual, unexpected, and unforeseen culmination thereof, although the activity was carried on intentionally and voluntarily, the result should be regarded as having been induced by accidental means although there was nothing in the precedent acts which would constitute a mishap, mischance, slip or unusual happening." Annotation, 56 *A. L. R.* 2d 800, 802, at § 2(a) (1957)

Other jurisdictions, however, hold that

"if an activity is being carried on voluntarily and intentionally in the usual way, death or disability, although following a heart attack or heart failure and assumed to be unexpected, cannot, without proof of some unusual happening preceding the heart attack or heart failure, which may have caused it, be regarded as produced by accidental means within the meaning of an insurance policy providing benefits for the results of such means." Annotation, *supra*, at *p*. 808, § 3(a)

The holding of our Supreme Court in *Korfin v. Continental Casualty Co.*, 5 *N. J.* 154 (1950), follows the view expressed first above.

In entering judgment in favor of plaintiff the trial court relied on *Korfin, supra*, expressing the reasons for such reliance as follows:

"In that case [*Korfin*] the policy covered bodily injury 'effected through accidental means.' The facts reveal that the insured's death resulted from encephalitis caused by the morbid reaction of his body to vaccine administered for the prevention of smallpox. The vaccination had taken place pursuant to arrangements previously made by the patient with his physician. Nothing untoward marked the administration of the vaccine. The insurance carrier argued that the policy terms were not met because injury came about, not from 'accidental means,' but as an 'accidental result.' However, the Supreme Court, in reversing a judgment for defendant, reasoned that

there was in the act which preceded the death ' "something unforeseen, unexpected, unusual," ' to wit, 'the application of the vaccine to one who had evidently a hypersusceptibility or allergy to the vaccine that was used.'

In the instant case the policy provides indemnity for 'bodily injury sustained  * * *  as the result of an accident, independent of all other causes.' The defendant argues that the word 'accident' in this policy is to be equated with the expression, 'accidental means,' as found in the *Korfin* case. Accepting this contention, it seems to me that the result reached in the *Korfin* case must control the disposition of the present controversy.

In the case now before the court the factual situation is uncomplicated. The plaintiff suffered a myocardial infarction from the effort and stress involved in doing his customary work on February 11, 1959. For the 25 years of his employment he had been doing the same kind of work, but in his later years his tasks had become less onerous than formerly. Save for a bout with dysentery in the '1950's' his medical history had been negative. He had lost no time from work. Thus, his daily labors had been consistently engaged in without untoward incident. However, on the occasion in question, there was an unexpected adverse reaction by his body to the discharge of the work load imposed upon it. The blood supply to his heart became insufficient to meet the labors imposed upon that organ and myocardial infarction was the result.

I can discern no essential difference between the factual composites of the cited case and the one now before the court."

In challenging the legal propriety of the judgment entered in favor of plaintiff in the case at bar, defendant asserts that the court "misinterpreted and misapplied the *Korfin* case." Amplifying that criticism, defendant's brief stresses that "in order to find coverage under the policy" the court in *Korfin* "found it necessary" to discern the existence of "something unforeseen, unexpected and unusual in the act which preceded the insured's death." Pursuing that contention, defendant argues that while there "may be room for argument as to the sufficiency" of the insured's "unknown hypersusceptibility to the vaccine" as constituting "an unforeseen and unexpected element in the act preceding injury," as found in *Korfin,* there was "nothing unforeseen, unexpected or unusual in what the plaintiff did or how he did it" in the case at bar.

Defendant's counsel, noting that *Korfin* "was decided by a divided court," then concludes with the statement that "the

case at bar is totally lacking in the element, slender though it was, which was laid hold of to sustain coverage under the policy in *Korfin."*

We disagree with the foregoing conclusion and with counsel's characterization of the proofs in the cited case. It is apparent that defendant's counsel, although somewhat reluctantly accepting the holding in *Korfin,* contends that the trial court's reliance thereon in the instant case is erroneous in finding any element of accident in "a course of events which had been initiated [by Harris] voluntarily."

We find it unnecessary to review in detail the numerous cases cited by counsel in support of their respective contentions. It is clear that defendant's challenge of the judgment in the instant case is grounded upon its rejection of plaintiff's contention that "there was in the act which preceded George Harris' bodily injury, something unforeseen, unexpected, unusual, viz.: the application of strain to one who evidently had a hypersusceptibility or incapacity to absorb the strain that was imposed." Apart from defendant's aforesaid additional contention that underlying arteriosclerosis was the basic cause of plaintiff's disability, to which reference is hereinafter made, it is clear that defendant, conceding *arguendo* that plaintiff's act of lifting the tanks was at least a contributing cause of his disability, stresses that it was "a voluntary" act and that there "was nothing accidental about the way in which the insured sustained his injury." We find that in both *Korfin* and in the case at bar the disastrous results were produced by unforeseen occurrences despite the fact that the initial acts were voluntary.

We agree with the trial court's analysis of the facts in the case at bar and with its reasoning in holding that *Korfin* was pertinent and controlling. In Korfin's physiology there existed a condition, unknown at the time he was vaccinated, which condition in conjunction with the act of vaccination resulted in his death. *Korfin, supra,* 5 *N. J.,* at *p.* 160. In the case at bar there was in the act which preceded plaintiff's bodily injury, something "unforeseen, unexpected, unusual,"

the imposition of a strain on one who had a hypersuscepti- bility or incapacity to absorb it. This, the trial court held, constituted "an accident" within the meaning of the policy. We are in accord.

■■ Nor do we agree with defendant that the proofs establish that plaintiff's disability was so caused or contributed to by disease as to preclude indemnification under the policy. *Kievit v. Loyal Protect. Life Ins. Co.*, 34 *N. J.* 475 (1961). The following quotations from *Kievit* are particularly perti- nent to the case at bar:

"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to tech- nical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded 'to the full extent that any fair interpretation will allow.' [at *p.* 482]

\*    \*    \*    \*    \*    \*    \*    \*

We are not here concerned with and therefore need not pass upon a situation such as that presented in *Runyon v. Monarch Accident Ins. Co.*, 108 *N. J. L.* 489 (*E. & A.* 1932) and *Runyon v. Common- wealth Casualty Co.*, 109 *N. J. L.* 238 (*E. & A.* 1932), where a patent, active disease was found to have contributed with the accident to the resulting death of the insured. We are here concerned with a latent, inactive condition or disease which was not accompanied by any symptoms and which was precipitated or activated by the accident into a resulting disability; \*   \*   \*. [at *p.* 483]

\*    \*    \*    \*    \*    \*    \*    \*

When the Company issued its accident policy to Mr. Kievit it knew that, although he was then about 48 and in good health, he could and presumably would keep the policy in force until he was 65 and that in the course of time he would undoubtedly be subjected to bodily con- ditions and diseases incident to the aging process. If the terms of the policy were read literally, the policy would be of little value to him since disability or death resulting from accidental injury would in all probability be in some sense contributed to by the infirmities of age. See *Inter-Ocean Casualty Company v. Scott*, 91 *Ga. App.* 311, 85 *S. E.* 2d 452, 456 (*Ct. App.* 1954). Such literal reading was never contemplated and it may fairly and justly be concluded that it also was never contemplated that indemnity would be unavailable where a condition or disease which was wholly dormant was activated and became disabling as the result of accidental injury." [at *p.* 489]

The judgment of the trial court is affirmed.